# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | CRIM. NO. 09-368 |
| | : | |
| SAM STALLINGS | : | |

**Diamond, J.** February 22, 2010

## MEMORANDUM

Acting on an anonymous tip, police seized two guns from the car of Defendant Sam Stallings. The grand jury charged Defendant with one count of being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). Defendant moved to suppress both guns on Fourth Amendment grounds. (Doc. No. 19.) On January 22, 2010, I held an evidentiary hearing, after which I denied the Motion and stated that I would issue this Memorandum setting forth my findings and conclusions pursuant to Fed. R. Crim. P. 12(d).

## I. FINDINGS OF FACT

At the January 22nd suppression hearing, the Government presented the testimony of Philadelphia Police Officers Ivan Rosado and David Marcellino, photographs of Defendant's car, and other evidence relating to the seizure of the guns. Defendant presented no evidence. I credit the testimony of both Officers, and I find that the Government has proven the following facts by a preponderance of the evidence.

    1.    Ivan Rosado has been a Philadelphia Police Officer for eleven years and has been assigned to the Philadelphia Highway Patrol for the past five and a half years. (1/22/10 Tr. at

3:7-11.) David Marcellino, a Philadelphia Police Officer for over ten years, has been assigned to Highway Patrol for six years. (Id. at 45:1) As members of Highway Patrol, Officers Rosado and Marcellino are assigned to neighborhoods "where they have gun violence and robberies." (Id. at 3:14-17.) The neighborhood in northwest Philadelphia where the events giving rise to this matter took place is a high-crime area, with "a lot of gun crimes, a lot of shootings, a lot of robberies." (Id. at 17:2-4; 6:24-25; 40:3-9.) In recent years, several police officers – most recently, Officer Charles Cassidy – have been shot and killed while patrolling the neighborhood. (Id. at 17:1-5.)

  2. On the night of April 4, 2009, Officers Rosado and Marcellino were patrolling in a marked police car. (Id. at 3:20-4:17; 9:25.) "It was dark. . . really dark" at approximately 8:15 p.m., when a woman flagged the Officers down as they approached the corner of 21st and Madarie Streets. (Id. at 4:20-25; 16:20-23; 45:17-21.) The woman was African-American, wearing a three-quarter length black leather jacket and jeans. (Id. at 25:1-3.) The Officers were concerned that she might be the victim of a crime. (Id. at 25:14-15.) The woman told the Officers that a black man with a gun was around the corner sitting in a black Cadillac with chrome rims. (Id. at 5:18-25; 35:21; 45: 17-20.) The Officers were anxious to take immediate action. (Id. at 41:20-25; 42:1-7) ("[S]he's telling me something serious, there's a gun, there's a man armed with a gun in a Cadillac . . . I want to get there before he leaves or something happens."). Accordingly, they drove around the corner to investigate without first learning the woman's identity. (Id. at 5:21-22; 46:11-12.) ("She's not giving me a report of [a] stolen car . . . I'm going to get around the corner as fast as I can and investigate.")

3.       As the Officers turned the corner and approached 21st and Chelten Streets, they saw only one car on the street: a black Cadillac with chrome rims. (Id. at 5:22-25; 46:11-12.) The Officers drove in the direction of the Cadillac, which was parked directly facing the Officers. (Id. at 46:15-18.) As the Officers passed the Cadillac, they saw Defendant, who is African-American, in the driver's seat. (Id. at 5:25; 46:15-18.) As soon as Defendant saw the Officers, "[h]is seat starts going back . . . [s]tarts reclining the seat of the Cadillac and he starts going back, back." (Id. at 6:5-10.) "And as [the Officers] were passing him, he leaned back even more." (Id. at 46:17-18.) The Officers made a u-turn, pulled up behind the Cadillac, and shined a spotlight on the car. (Id. at 10:23; 46:24-25.) The Officers then left their patrol car and walked toward the Cadillac. Officer Rosado approached on the driver's side while Officer Marcellino approached on the passenger side. (Id. at 10:6-7; 47:1-4.)

4.       Defendant was still in the driver's seat, apparently talking on a cell phone. The area under the driver's seat was easily within Defendant's reach. (Gov. Ex. 1, 2.) Officer Rosado knocked on the driver's window. (1/22/10 Tr. at 11:4-7.) Defendant looked up at Officer Rosado, but did not otherwise respond. (Id.) Officer Rosado was concerned that he could not see Defendant's right hand. (Id. at 10:19-25.) ("I could see his left hand because he has a cellphone when I see it, but I can't see his right hand. I'm a little uncomfortable, you know. I got a complaint he has a gun, I don't see his right hand.") Officer Rosado then told Defendant to "open the door." (Id. at 6:12.) When Defendant did not respond, Officer Rosado opened the car door and said, "sir, somebody just said that you have a gun. Is there any weapons in this car?" (Id. at 6:12-14.) Defendant responded, "who called the cops on me?" (Id. at 6:14-16.) Officer Rosado was concerned that Defendant "[d]oesn't say no. He tells me, who called the cops on me. As an experienced officer, that's telling me something is wrong." (Id. at 23-25.) Still

3

unable to see Defendant's right hand, Officer Rosado quickly frisked around Defendant's waist while he sat in the car. (Id. at 11:22-25.) Seeing that Defendant was "really nervous" and that "his hands are shaking," Officer Rosado asked Defendant to step out of the car and conducted a complete frisk as Defendant stood immediately outside the car. From where he stood, Defendant could reach into the passenger compartment through the open driver's door. (Id. at 6:18-20; 12:7-10; 48:1-4.)

5.     As Officer Rosado frisked Defendant, Officer Marcellino walked to the open driver's door. (Id. at 48:17-22.) While Defendant remained seated, the area under the driver's seat was not visible to the Officers. Because he had moved the driver's seat as far back as possible, however, once Defendant got out of the car, the floor area underneath the seat was visible. (Id. at 19:1-5.) Standing outside the Cadillac, Officer Marcellino shined his flashlight on that area and immediately saw the handle of a gun. (Id. at 49:17-18.)

6.     Officer Marcellino signaled to Officer Rosado that he had found a gun. (Id. at 12:25–13:4.) Anxious to avoid a struggle with Defendant, "a big guy," Officer Rosado did not say that Officer Marcellino had just found a gun. (Id. at 8:6) Rather, Officer Rosado walked Defendant to the patrol car and "place[d] him in the back . . . where everything's nice and calm." (Id. at 7:10-11.) While Officer Rosado escorted Defendant, Officer Marcellino retrieved from under the driver's seat a 9mm Sig Sauer semi-automatic handgun loaded with thirteen live rounds. (Id. at 50:9-11; Gov. Ex. 7.)

7.     As Officer Rosado placed Defendant in the back seat of the patrol car, he asked Defendant if he had a license to carry a firearm. When Defendant responded that he did not, Officer Rosado handcuffed Defendant and began to ask him identification questions. (Id. at

4

15:15-17.) Defendant provided false identification papers indicating that he was "Craig Gay," to whom the Cadillac was registered. (Id. at 14: 24.)

        8.        After Officer Marcellino returned to the patrol car with the 9mm handgun, Defendant, still nervous, said "Come on, you got me. Lets get out of here." (Id. at 7:21-25; 8:1-2) As Officer Rosado testified:

> And to me, that was a little funny, why did he want, what's the rush? You're already arrested. I thought maybe we missed something, the guy is, you know, acting nervous, saying let's get out of here. You got me. So I told [Officer Marcellino] I think there might be something else in the [Cadillac].

(Id. at 7: 24-25; 8:1-4.)

        9.        The Officers returned to the Cadillac and began to search areas in the Cadillac that would have been within Defendant's reach as he sat in the car. (Id. at 8:4-10.) Because Defendant is a large man (approximately six feet three inches tall) and because his seat was fully reclined, he would have been able to reach the entire rear passenger area. (Id. at 8:6-8.) While searching that area, Officer Rosado noticed that the armrest in the middle of the back seat was down, revealing a hatch to the trunk. (Id. at 9-16.) Officer Rosado opened the hatch, and using a flashlight to look inside the trunk, saw a red bag and a semi-automatic rifle. (Id. at 20:14-23.) Defendant could have reached through the hatch to this trunk area as he sat reclined in the driver's seat. (Gov. Exs. 3-6.) Officer Rosado got out of the Cadillac, opened the trunk, and recovered a fully loaded black Ruger mini 30 assault rifle. (1/22/10 Tr. at 8:13-16; Gov. Ex. 8.)

## II. CONCLUSIONS OF LAW

    The Government concedes that even though the Cadillac was registered to "Craig Gay," Defendant Sam Stallings has standing to object to the search of the car. See United States v.

Baker, 221 F.3d 438, 443 (3d Cir. 2000) (a driver has "the requisite legitimate expectation of privacy to support standing for Fourth Amendment purposes" where "there is clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately"). Accordingly, I will assume for present purposes that Defendant has standing to move to suppress the guns recovered from the Cadillac.

Defendant contends that: 1) the anonymous tip that police received does not support a finding of "reasonable suspicion"; 2) the Officers recovered the 9mm handgun during an illegal search; 3) there was no probable cause to arrest Defendant; and 4) the assault rifle was seized during an impermissibly broad search incident to an illegal arrest. I do not agree. Because the police acted reasonably in the difficult circumstances presented, I conclude that they did not violate Defendant's Fourth Amendment rights. See Ohio v. Robinette, 519 U.S. 33, 39 (1996) ("We have long held that the touchstone of the Fourth Amendment is reasonableness.") (internal quotations omitted).

### A. Legal Standards

Once a defendant moves to suppress, the Government has the burden of showing by a preponderance of the evidence that police acted within the Constitution. United States v. Matlock, 415 U.S. 164, 177 n.14 (1974); United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Evidence recovered during a search unsupported by probable cause is "fruit of the poisonous tree" and must be suppressed. Wong Sun v. United States, 371 U.S. 471, 487 (U.S. 1963); United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006). It is well established that warrantless searches "are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (U.S. 1967).

It is also well established that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Terry v. Ohio, 392 U.S. 1 (1968). Reasonable suspicion is "based on the totality of the facts and circumstances." United States v. Mathurin, 561 F.3d 170, 174 (3d Cir. 2009).

B.    The Investigative Stop Was Supported by Reasonable Suspicion

Although not addressed by either Party, I must first determine when Defendant was stopped or seized within the meaning of the Fourth Amendment. See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) ("We begin by determining when the seizure of [the defendant] occurred, as that is the moment the Fourth Amendment becomes relevant.") (internal quotations omitted).

The police could shine a light on the Cadillac, knock on the driver's window, and speak to Defendant without implicating the Fourth Amendment. United States v. Brown, 334 F.3d 1161, 1163 (D.C. Cir. 2003) (investigative stop did not begin when police knocked on car window, but rather when police subsequently opened the door); United States v. Douglass, 467 F.3d 621, 624 (7th Cir. 2006) (shining police flashlights on a parked car does not implicate Terry); United States v. Valentine, 232 F.3d 350, 356 (3d Cir. 2000) ("[O]fficers are allowed to ask questions of anyone – and gun owners are no exception – without having any evidence creating suspicion."). For Terry purposes, the investigative stop began when Officer Rosado opened the door of Defendant's car. See Brown, 334 F.3d at 1164 (investigative stop began when officer opened the defendant's car door).

Relying on Florida v. J.L., Defendant argues that because the investigative stop was based on an anonymous tip, it was not supported by reasonable suspicion. 529 U.S. 266 (2000).

7

The J.L. Court ruled that an anonymous telephone tip to police – "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" – did not provide a reasonable basis to stop and frisk the young man. Id. at 268. The J.L. Court recognized, however, that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" Id. at 270 (quoting Alabama v. White, 496 U.S. 325, 326 (1990)). In United States v. Valentine, the Third Circuit confirmed this recognition, deeming reliable an anonymous tip given to police *in person* regarding a man with a gun at a nearby location. 232 F.3d at 355. Because Valentine is especially instructive, I will discuss it at some length.

The police in Valentine were approached late at night in a high crime area of Irvington, New Jersey by "a young black man in his early twenties [who] flagged [their patrol car] down and explained that he had just seen a man with a gun." Id. at 352. The informant refused to give the police his name. The Third Circuit deemed the tip reliable because it was provided in person, concerned an incident that was likely ongoing, and because the "officers could quickly confirm or disconfirm the tip, . . . could assess the informant's credibility as he spoke . . . and had some opportunity to find the informant if the tip did not pan out." Id. at 355.

Although no two search and seizure cases present precisely the same facts, Valentine nonetheless controls here with respect to the reliability of the tip given to Officers Rosado and Marcellino. In a neighborhood known for gun violence, a woman stopped the Officers to report that a man in a distinctive car a block away had a gun. The Officers were able to assess the woman's credibility as she spoke to them, and their immediate response indicates that they found her credible. See Valentine, 232 F.3d at 355 ("From the fact that the officers acted, and acted quickly, after receiving the tip, a court may deduce that the officers thought the tipster's

8

demeanor, voice, and perhaps a host of other factors supported the reliability of the tip."); see also United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002) (anonymous in person tip has "greater reliability . . . because the officers had an opportunity to appraise the witness's credibility through observation"). Although in their hurry to investigate, the Officers failed to obtain the woman's name, I am "not going to second-guess the officers' decision to pursue the suspect immediately." Valentine, 232 F.3d at 355. Moreover, although "[w]hat matters for our purposes is not that the officers could guarantee that they could track down the informant again," the Officers had the "opportunity to find the informant if the tip did not pan out. " Id.

In any event, the "tip" did "pan out." Once they drove around the corner, the Officers were able immediately to corroborate aspects of what the woman had told them: the car, its location, and its driver matched her descriptions. See Nelson, 284 F.3d at 483 (3d Cir. 2002) (officers' ability to corroborate details regarding vehicle described in anonymous tip enhanced reliability of tip); see also United States v. Johnson, 2010 U.S. App. LEXIS 1843, at *17 (3d Cir. Jan. 27, 2010) ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided."). In these circumstances, I conclude that under Valentine the woman's tip was reliable.

Of course, "the reliability of a tip . . . is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances." Id. Here, the context and surrounding circumstances further support a finding of reasonable suspicion. The woman reported that a man had a gun at night in an area prone to gun violence and police shootings. See Wardlow, 528 U.S. at 124 ("[T]he fact that the stop occurred in a high crime area among the relevant contextual considerations in a Terry analysis.") (internal quotation marks and citations omitted); United States v. Goodrich,

9

450 F.3d 552, 561 (3d Cir. 2006) ("The lateness of the hour of the stop further supports the inference of criminal activity, especially when considered alongside the area's reputation for criminal activity."). Moreover, as soon as Defendant saw the Officers approaching he tried to hide, leaning as far back in his seat as he could. See United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) ("[S]louching, crouching, or any other arguably evasive movement [of a defendant in a vehicle], when combined with other factors particular to the defendant or his vehicle, can add up to reasonable suspicion."). When Officer Rosado knocked on the car window and said "open the door," Defendant ignored the Officer and kept talking into his cell phone. Finally, Defendant kept his right hand hidden from police view, thus making the circumstances more suspicious and adding to the Officers' legitimate concern for their safety. See Valentine, 232 F.3d at 357 ("As the Supreme Court noted in a case much like ours, an officer has 'ample reason to fear for his safety' while investigating a person reported to have a concealed weapon at 2:15 in the morning in a high-crime area.") (quoting Adams v. Williams, 407 U.S. 143, 147-48 (1972)); see also United States v. Gorham, 1996 U.S. App. LEXIS 30545, at *1-2 (D.C. Cir. Oct. 21, 1996) ("[The defendant's] suspicious actions in a high crime area, his reaction to police attention, and his furtive movement hiding a plastic bag so that his hand was hidden from view, created a totality of circumstances giving rise to a reasonable articulable suspicion that criminal activity might be afoot and that [the defendant] might be armed and dangerous.").

In these circumstances, "given the large number of potential crimes and the danger posed by an armed criminal, . . . if the police officers had done nothing and continued on their way after receiving the [woman's] tip, the officers would have been remiss." Valentine, 232 F.3d at 356. Accordingly, I conclude that Officers Rosado and Marcellino had a reasonable suspicion of

ongoing criminal activity warranting a Terry stop and frisk of Defendant. That stop began when Officer Rosado opened the door of Defendant's car.

C.     The Officers' Properly Seized the 9mm Handgun

Once the Officers opened the car door and began their valid investigatory stop, they could permissibly order Defendant to get out of his car. See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (police may order an individual to step outside of a car while conducting a valid Terry stop). As I have found, once Defendant got up, the gun under his seat became visible to Officer Marcellino, who was standing outside the Cadillac. It is well established that "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately" without a warrant. United States v. Yamba, 506 F.3d 251, 256 (3d Cir. 2007). Because the Officers "did not violate the Fourth Amendment in arriving at the place from which the [gun] could be plainly viewed," Officer Marcellino's warrantless seizure of the firearm was permissible. See Horton v. California, 496 U.S. 128, 136 (1990); see also Texas v. Brown, 460 U.S. 730, 740 (1983) (police officer who shined flashlight into suspect's car and saw contraband in plain view could lawfully seize the contraband without a warrant.)

Moreover, the Third Circuit has also held that a limited search for weapons during a Terry stop "may extend beyond the person of the suspect to the area under his immediate control, including a passenger compartment of an automobile." United States v. Sobratti, 70 Fed. Appx. 73, 76 (3d Cir. 2003). As the Supreme Court has explained:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Michigan v. Long, 463 U.S. 1032, 1049 (1983)(quoting Terry, 392 U.S. at 21). As I have found, while Defendant was being frisked both inside and immediately outside the Cadillac, he could reach under the driver's seat. Accordingly, I conclude in the alternative that as they frisked Defendant the Officers could properly search under the driver's seat of the Cadillac.

    **D.    There was Probable Cause to Arrest Defendant**

Defendant also contends that his investigative stop became an arrest once Officer Rosado escorted him to the patrol car and placed him in the back seat. Because Defendant believes this arrest was not based on probable cause, he argues that the assault rifle must be suppressed as the fruit of that arrest. (Doc. No. 19.) I disagree.

Once Officer Marcellino discovered the 9mm handgun under the driver's seat, for his own safety Officer Rosado escorted Defendant to the back of the nearby patrol car and held him very briefly until Defendant said he did not have a license for the handgun. This brief detention was "sufficiently limited in scope and manner to satisfy the conditions of [the] investigative stop" and thus did not become a *de facto* arrest. Florida v. Royer, 460 U.S. 491, 500 (1983). The Officers arrested Defendant moments later when he admitted that he did not have a license for the handgun found in his car. That arrest was certainly based on probable cause: Defendant had just admitted to committing a felony under Pennsylvania law. See 18 Pa. Cons. Stat § 6106 (felony to possess or carry an unlicensed firearm on one's person or in a vehicle); United States v. Cooper, 293 Fed. Appx. 117, 120 (3d Cir. 2008) (probable cause to arrest where "[a]fter discovering [defendant] possessed a concealed firearm, the police officers asked him whether he was licensed to carry a concealed weapon . . . [and defendant ] admitted illegal activity by responding that he was not licensed").

In these circumstances, the recovery of the assault rifle followed Defendant's lawful arrest.

### E. Seizure of the Assault Rifle Was Otherwise Permissible

Defendant argues in the alternative that even if his arrest was lawful, I must nonetheless suppress the assault rifle because it was discovered pursuant to an impermissibly broad search incident to that arrest. Again, I disagree.

The Supreme Court has held that police may search a vehicle incident to an occupant's arrest for two purposes. First, "[w]hen the arrestee is unsecured and within reaching distance of the passenger compartment," police may search the vehicle for their own safety. Arizona v. Gant, 129 S. Ct. 1710, 1719 (U.S. 2009). In addition, after the arrestee is secured, "[p]olice may search [the] vehicle incident to arrest . . . [if] it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 1723; see United States v. Vinton, 2010 U.S. App. LEXIS 2450, *5 (D.C. Cir. Feb. 5, 2010). It is this second purpose – the gathering of evidence – that is implicated here and so requires further explanation.

After they have arrested and secured the occupant of a vehicle, police may then search those areas in the vehicle that had been within the occupant's "immediate control . . . mean[ing] the area from within which he might" have concealed or destroyed evidence. Chimel v. California, 395 U.S. 752, 763 (1969). This area usually does not include the car trunk because usually it is not possible for a driver or passenger to reach into the trunk while seated in the vehicle. See Gant, 129 S. Ct. at 1716 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."); United States v. Baker, 221 F.3d 438, 443 (3d Cir. 2000) ("[S]uch a search incident to arrest does not extend to the trunk of the

13

car . . . ."). Where access to the trunk was "readily accessible to the [former] occupant[] without exiting the vehicle," however, a warrantless search of the trunk after the occupant's arrest is permissible. United States v. Olguin-Rivera, 168 F.3d 1203, 1206 (10th Cir. 1999) (upholding warrantless search of car hatchback incident to arrest because hatchback was accessible from passenger compartment); see also United States v. Allen, 469 F.3d 11, 15 (1st Cir. 2006) ("[W]here a search is limited to areas accessible from within the passenger compartment, including areas that are 'hatches,' or rear storage areas, it will be permissible in scope."); United States v. Doward, 41 F.3d 789, 794 (1st Cir. 1994) (car's passenger compartment includes any area "generally reachable without exiting the vehicle") (overruled on other grounds).

As I have found, Defendant was able to reach into the car trunk as he sat in the driver's seat. Accordingly, incident to their arrest of Defendant, the Officers could, without a warrant, properly search the Cadillac's trunk for evidence.

Finally, the Supreme Court has long held under the automobile exception to the warrant requirement that "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 809 (1982); See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999) (if police have probable cause to believe that a vehicle holds evidence of a crime, they may conduct a warrantless search of any area within the vehicle where such evidence may be found). The Third Circuit has explicitly held that such a search includes the car's trunk:

> [T]he police need have no more exact suspicions to search a trunk than are required to search the passenger compartment under the automobile exception, nor need they have independent reason to believe that the contraband for which they are searching is located specifically in the trunk.

United States v. Rickus, 737 F.2d 360, 367 (3d Cir. 1984)(citing United States v. Schecter, 717 F.2d 864 (1983)).

In accordance with this authority, I conclude in the alternative that the Officers could properly search the entire Cadillac, including the trunk, without a warrant. Given that the Cadillac was parked when the Officers arrived, it is undisputed that the car was "lawfully stopped." Moreover, there was probable cause to believe that the car might "conceal the object of the search." Ross, 456 U.S. 798 at 809. Once again, two experienced Officers were in a neighborhood oppressed by gun violence at night when a woman informed them that a black man with a gun was sitting in a distinctive car around the corner. Seconds later, the Officers found Defendant in a car around the corner matching those descriptions. As he saw the Officers, Defendant tried to hide inside the car. When the Officers approached, he kept one hand hidden while he pretended not to notice them and talked into his cell phone. Defendant ignored Officer Rosado's knock on the window and his order to get out of the car. When Officer Rosado asked Defendant if he had a gun in the car, Defendant, who appeared quite nervous and whose hands were shaking, said "who called the cops on me?" After police found an unlicensed gun in the car, Defendant still seemed nervous and urged the Officers to leave. In light of their experience, both Officers took this to mean that there were other weapons in the car that Defendant did not want the police to find.

In these circumstances, the Officers had probable cause to believe that there was additional contraband in the Cadillac. Accordingly, the Officers could search the entire vehicle, including the trunk, without first obtaining a warrant. See Rickus, 737 F.2d at 367 (police presented with "ample evidence" during a valid investigatory stop – including items frequently used in burglaries and the defendant's unusual desire to leave the scene – had probable cause to

search trunk of vehicle); see also United States v. Miller, 265 Fed. Appx. 5, 8 (2d Cir. 2008) (once a firearm was lawfully discovered in passenger area of car, police "had sufficient probable cause under the automobile exception to justify their search of [the car's] trunk").

The Officers thus legally recovered the assault rifle from the Cadillac's trunk.

### III. CONCLUSION

Faced with stressful, difficult circumstances, Officers Rosado and Marcellino responded in a measured, responsible manner consistent with the Fourth Amendment. Accordingly, I denied Defendant's Motion to Suppress the guns recovered during the Officers' search of Defendant's car.

**BY THE COURT.**

*/s/ Paul S. Diamond*

**Paul S. Diamond, J.**